371 F.2d 221
 UNITED AIR LINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
American Airlines, Inc., Trans World Airlines, Inc., City and County of San Francisco, California, Detroit Aviation Commission, Board of County Road Commissioners of Wayne County, Michigan, Greater Detroit Board of Commerce, and Los Angeles Chamber of Commerce, Intervenors.
 No. 15606.
 United States Court of Appeals Seventh Circuit.
 January 4, 1967.
 
 William E. Doyle, Robert L. Stern, H. Templeton Brown, Henry L. Hill, Chicago, Ill., for petitioner. Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel.
 Joseph B. Goldman, Gen. Counsel, Frederic D. Houghteling, Atty., Civil Aeronautics Board, Washington, D. C., O. D. Ozment, Deputy Gen. Counsel, Warren L. Sharfman, Associate Gen. Counsel, Litigation and Legislation, Donald F. Turner, Asst. Atty. Gen., Jerry Pruzansky, Atty., Dept. of Justice. General Counsel, Civil Aeronautics Board, for respondent.
 
 
 1
 Paul E. Iverson, Los Angeles, Cal., George B. Christensen, Chicago, Ill., Alfred V. J. Prather, Joseph M. Paul, Jr., Washington, D. C., Frank J. Needles, Deputy City Atty., San Francisco, Cal., Harold Hood, Asst. Corp Counsel, Donald A. Campbell, Peter Shian, Detroit, Mich., for intervenor.
 
 
 2
 Thomas M. O'Connor, William F. Bourne, James B. Brasil, San Francisco, Cal., for the City & County of San Francisco.
 
 
 3
 Prather, Levenberg & Seeger, Washington, D. C., for intervenor American Airlines, Inc.
 
 
 4
 Chadbourne, Parke, Whiteside & Wolff, Washington, D. C., of counsel, for intervenor Trans World Airlines, Inc.
 
 
 5
 Before SCHNACKENBERG, KILEY and SWYGERT, Circuit Judges.
 
 
 6
 SWYGERT, Circuit Judge.
 
 
 7
 United Air Lines, Inc. petitions for review of those portions of two orders[1] of the Civil Aeronautics Board which removed restrictions on the operating authority of American Airlines, Inc. and Trans World Airlines, Inc. in the Detroit-Los Angeles and Detroit-San Francisco air travel markets. The orders arose out of a proceeding instituted by the Board in 1960 to determine whether the "public convenience and necessity" required the lifting of restrictions in the certificates of all three carriers which prevented them from offering "nonstop,[2] turnaround"[3] passenger services to the public in these markets. United's petition is principally directed against the Board's alleged failure to consider and apply to the evidence the standards established by section 102 of the Federal Aviation Act of 1958, 49 U.S.C. § 1302, for a determination of the "public convenience and necessity."
 
 
 8
 Prior to the Board's decision, United was the only carrier authorized to fly nonstop between Detroit and Los Angeles and Detroit and San Francisco. United's flights between these cities, however, were required to originate or terminate at either New York or Philadelphia. American's Detroit-California flights had no such long-haul restriction, but they were subject to a one-stop restriction, the stop being required at Chicago. TWA had alternative restrictions between Detroit and the California cities. On the one hand, TWA had turnaround authority in these markets, but all flights of this nature were required to stop at either St. Louis or Kansas City. On the other hand, TWA could provide one-stop service via Chicago, but only on flights which also served New York. The orders challenged by United grant unrestricted authority to all three carriers to serve the Detroit-Los Angeles and Detroit-San Francisco markets.
 
 
 9
 Public hearings in this proceeding were held before an examiner in 1964. Evidence was presented by the carriers, civic groups representing the communities concerned, and representatives of the Board's staff. The examiner issued his initial decision on February 25, 1965, recommending the removal of all restrictions. Following the submission of briefs and arguments to the Board, the Board affirmed the examiner's decision, adopting the decision as part of its order with one reservation discussed later.
 
 
 10
 On the question of passenger authority, the examiner first noted the size, economic strength, and high air-traffic rankings of Detroit, Los Angeles, and San Francisco. He found a strong community of interest among these areas, and pointed to statistics showing that Los Angeles and San Francisco consistently appear among Detroit's first five air travel markets, while Detroit ranks fifth among Los Angeles' markets and seventh among San Francisco's markets.
 
 
 11
 Next, the examiner outlined the rapid growth of these markets between 1960 and 1963, described the fluctuating market shares of United, American, and TWA operating under their existing restrictions during this period, and analyzed the unique circumstances which contributed to the market conditions. In the latter respect, the examiner noted that American had achieved a position of dominance in both Detroit-California markets despite its one-stop restriction, carrying over half of the Detroit-Los Angeles traffic and nearly two-thirds of the Detroit-San Francisco traffic in 1963. United, with its nonstop authorization (unused in the Detroit-San Francisco market until 1964), carried less than one-third of the Detroit-Los Angeles traffic and less than one-fifth of the Detroit-San Francisco traffic during the same year, while TWA's share of both markets had been reduced to comparative insignificance, even though it had been a vigorous competitor in the Detroit-Los Angeles market a few years earlier, carrying slightly less than one-third of the traffic in 1960. The examiner accounted for the market fluctuation in part by American's early use of Detroit's Metropolitan Airport, which was more convenient to the city than Willow Run Airport, utilized by United and TWA while awaiting completion of their facilities at Metropolitan, and in part by a special, lower "economy service" fare offered between Chicago and Los Angeles by American in recent years.
 
 
 12
 The examiner then embarked upon an extensive analysis of the service being provided in the Detroit-California markets in relation to the service afforded in comparable markets throughout the country. In his words, "by reason of their relative size and importance valid conclusions can be drawn from proper comparisons with the other major markets in respect of the number of nonstop authorizations, the number of nonstop schedules provided, and the extent to which such schedules are utilized." The examiner found that the existing Detroit-California pattern of service occupied a very low position from every standpoint in which comparisons were drawn.
 
 
 13
 Having thus determined that an "enlargement of the nonstop authorizations" was required, the examiner stated that "consideration of all the significant aspects of the existing situation" led him to conclude that the nonstop, turnaround restrictions of all three carriers in both markets should be eliminated. Among the factors considered by the examiner in reaching this conclusion were competition, carrier priority rights, adverse financial effects, and Board precedent.
 
 
 14
 In his discussion of the first factor, the examiner noted that United, TWA, and American were already in competition in the Detroit-California markets, that this three-carrier competitive pattern was "deliberately established" by the Board, that each carrier had made a "satisfactory" contribution, and that the markets were "adequately" serviced under the pattern. Accordingly he concluded that removing all the restrictions would not materially affect the existing competition or be a "measurable impediment to the opportunity of the other * * * carriers to participate in the traffic movement." As to carrier priority, the examiner found that none of the carriers had any claim to preferential treatment either by reason of time of entry into the market,[4] operational investment, or, because of the circumstances mentioned earlier, market penetration. In considering possible adverse financial effects, the examiner stated that it had not been shown that lifting all of the restrictions would precipitate a "significant" shifting of revenues among the carriers. He rejected estimates of losses prepared by United in the event American and TWA acquired nonstop authorizations because the estimates assumed that all three carriers would schedule and maintain more flights than the market would bear. Finally, the examiner found the facts as to competition, priority, and financial effect closely parallel to the Board's decision in Louisville-New York Nonstop Investigation, 21 C.A.B. 794 (1955), and held that decision persuasive and applicable.
 
 
 15
 In its order, the Board affirmed the examiner's decision, summarizing his findings and adopting his opinion in so doing. The Board, however, stated that its conclusion was not based "on a comparison of the number of nonstop carriers authorized in markets thought to be comparable to the Detroit-California markets." Subsequently, in its order denying United's petition for reconsideration, the Board reaffirmed its position that "there is no departure here from the established principle that route awards are not made solely upon the basis of comparison with the number of carriers authorized to provide service in other markets."
 
 
 16
 The parties are in agreement that the removal of restrictions upon the operating authority of a carrier is a step which can be taken by the Board only after a determination that the "public convenience and necessity" so requires.[5] There is also general agreement that in making such a determination, the Board is required to follow the guidelines established by section 102 of the act. United alone, however, insists that the matters to be considered as being in the public interest under this section have been ignored by the Board. United maintains that the examiner's decision approved by the Board was based exclusively upon a comparison of the service authorized in other markets, wholly disregarding both the need for additional nonstop services and the economic consequences of removing the restrictions from the certificates of American and TWA.
 
 
 17
 Among other factors, section 102 requires the Board to consider the "present and future" needs of the public for air service, the fostering of "sound economic conditions" in air transportation, the promotion of "adequate, economical, and efficient" service without "destructive competitive practices," and "[c]ompetition * * * necessary to assure the sound development of an air-transportation system" adapted to the needs of the public. It is evident from these broadly-phrased objectives that a "public convenience and necessity" determination may be made without strict adherence to rigid or definitive criteria, and that the Board may exercise a broad discretion in effectuating the congressional policy. The Board may weigh both favorable and unfavorable considerations according to the particular situation before it, and no single factor need be decisive in all cases. As we stated recently in Outagamie County v. C. A. B., 355 F.2d 900, 906 (7th Cir. 1966), given circumstances "may weigh heavily in the balance in one case but be missing from the scales completely in another * *." The Board is charged with, and equipped for, resolving questions presented by competing considerations, and because we are satisfied that it has adequately weighed the relevant elements in this case we do not think that it has abandoned the mandate of section 102 or otherwise abused its discretion in modifying the operating authority of the carriers concerned.
 
 
 18
 The Board claims that in the past it has assessed weight to certain factors in cases dealing with the removal of restrictions upon carriers already competing in a market different from the weight it has assessed to the same factors in cases concerning the certification of new carriers in a market. In restriction removal cases involving competing carriers, the Board says, the "factors particularly worthy of consideration" are the "operational flexibility" of the carriers and the maintenance of the competitive balance. In such cases the Board has given somewhat lesser emphasis to the immediate need for improved or additional service and the economic feasibility and potential competitive injury of the service, although these factors are admittedly of some relevance. The Board explains that economic feasibility and competitive injury have been deemphasized in restriction-removal cases because the lifting of a restriction merely permits, rather than demands, additional service (thus leaving the performance of the service to the business judgment of the carrier), and because a threatened injury to another carrier must be "so serious as to outweigh the benefits" of removing the restriction. Although we think that an indiscriminate application of the "operational flexibility" factor and an overreliance upon the marketplace in providing economic answers are not without some hazards, the Board's resolution in this case was sufficiently attuned to section 102 of the act to require our approval.
 
 
 19
 The examiner did consider all the information presented in determining to remove the one-stop and long-haul restrictions. He took into account the need for improved service, the state of competition, potential injury, and other matters. In evaluating the necessity for additional nonstop authorizations, he considered several factors, including the size, strength, and growth of the markets, and the service in comparable markets. He did not rely exclusively upon conditions in other markets, as United argues, and we see no reason why the comparisons drawn were not relevant considerations. The examiner ultimately weighed the benefits to the public (added convenience, improved service, and the maintenance of competitive equilibrium) and the benefits to the carriers (the Board's "increased operational flexibility") against the possible adverse economic consequences to the competing carriers. He found that United's fear of injury was more apparent than real and that the benefits accruing from improved services dictated the conclusion that the removal of the restrictions of all three carriers in the Detroit-California markets was in the public interest. We think that an application of the standards of the act is inherent in this approach.
 
 
 20
 United's position is that the only relevant markets are the Detroit-Los Angeles and the Detroit-San Francisco "nonstop" markets and that United, as the only authorized nonstop carrier in these markets prior to the inception of the Board's investigation, may not be "deprived" of its "valuable rights" to serve them free from the competition of other carriers because "one-half of the seats on existing nonstop flights were going unused." The weakness in United's position is apparent. First, it must be recalled that American far outstripped United in the transportation of passengers between Detroit and the California cities, and that until this proceeding began United did not even maintain a nonstop Detroit-San Francisco flight. Carrying this portion of United's argument to its logical conclusion would result in the untenable position that so long as American continued to provide sufficient service under its one-stop authorization to carry the bulk of the traffic, United's nonstop service must be considered adequate. Second, the Board properly proceeded on the basis that the real issue concerned the service being offered to the public by three authorized and competing carriers in the Detroit-Los Angeles and Detroit-San Francisco air travel markets as a whole. It necessarily viewed the problem as involving a three-carrier pattern of service subject to restrictions dating from an earlier period of air travel. The Board found that even though these earlier restrictions had not stifled the growth of the markets they were a sufficient hindrance to both the carriers and the public in the furnishing of more efficient services to authorize their removal.
 
 
 21
 The Board's findings are supported by substantial evidence and its conclusions are in accordance with the standards of the act.
 
 
 22
 The Board's orders are affirmed.
 
 
 
 Notes:
 
 
 [1]
 Order No. E-23159, issued January 25, 1966, and Order No. E-23382, issued March 18, 1966, denying United's petition for reconsideration. The orders also concern cargo authority not pertinent here
 
 
 [2]
 "Nonstop" services, as the term suggests, are those which make no intermediate stops between designated cities. Restrictions upon such services are identified by the number of stops which must be made, for example, "one-stop" or "two-stop" restrictions
 
 
 [3]
 "Turnaround" services are those which permit a carrier to originate a flight at one city and terminate it at another. Restrictions preventing the offering of turnaround services in a given market are generally referred to as "long-haul" restrictions
 
 
 [4]
 Both American and TWA acquired authority in one or the other of the Detroit-California markets prior to 1940; United obtained its authority in 1944
 
 
 [5]
 49 U.S.C. § 1371(g)